IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.:

ECOM AUTHORITY, LLC,

    Plaintiff,

v.

AMAZON.COM SERVICES, LLC,

    Defendant.

_____/

## Verified Complaint for Injunctive Relief

1.    This case highlights a systematic overreach by Defendant Amazon.com Services LLC ("Amazon") that has resulted in profound harm to Plaintiff Ecom Authority LLC ("EA") and hundreds of its clients. As a premier member of Amazon's Service Provider Network, EA has been a model participant in Amazon's marketplace, adhering to every required standard and diligently managing the businesses of numerous sellers. Despite this, Amazon has arbitrarily and unjustly compromised over 595 seller accounts connected to EA, without legitimate cause or due process, leading to a cascade of irreparable financial, reputational, and operational damage.

2.    Amazon's conduct is not only heavy-handed but also entirely opaque, cloaked in vague allegations of fraud and misconduct, none of which Amazon can substantiate with credible evidence. Instead, Amazon has wielded its platform dominance to freeze EA's clients' funds, dispose of their inventory, and dismantle their livelihoods, all while denying any meaningful recourse.

3.    The result is devastating. There are millions of dollars in inventory held or destroyed, substantial funds frozen, and thousands of dollars in unwarranted fees levied against EA's clients. More troubling still is the existential threat Amazon's actions pose to small businesses

1

that rely on the platform for their survival – businesses that have now been rendered unable to fulfill orders, generate revenue, or maintain customer relationships. Despite EA's exhaustive efforts to resolve the matter through the proper channels, Amazon has responded with indifference, offering no clear path to resolution. Left with no alternative, EA now desperately seeks the intervention of this Court to halt Amazon's arbitrary practices, recover the massive financial losses which continue to accrue, and restore fairness in a marketplace that has become a crucible for small businesses.

## Jurisdiction, Parties, and Venue

4.      This is an action for damages exceeding $75,000 exclusive of all interest, court costs, and attorneys' fees, and involves a citizen one state against a citizen of a foreign state. Diversity jurisdiction is therefore proper before the federal district courts pursuant to 28 U.S.C. § 1332(a)(2).

5.      Plaintiff Ecom Authority, LLC is a Florida limited liability company domiciled in Miami-Dade County, Florida.

6.      Defendant Amazon.com Services, LLC. is a Delaware limited liability company domiciled in Seattle, Washington but conducts substantial and not isolated business activity in Miami, Florida through its fulfillment center located at 1900 NW 132nd Place, Miami, Florida, 33182 and has otherwise obtained a certificate of authority from the Florida Secretary of State to transact business in the State of Florida.

7.      Venue is proper in the U.S. District Court for the Southern District of Florida, Miami Division, since Amazon: (1) resides in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because it conducts substantial and not isolated business activity in this judicial district and is other subject to the Court's in personam jurisdiction in this judicial district;

(2) this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred; and (3) this judicial district is where a substantial part of property that is the subject of the action is situated. *See* 28 U.S.C. §1391.

8. All conditions precedent relevant to the instant action have been performed, excused, complied with, or have otherwise been waived.

## Relevant Background

**A. About Ecom Authority, LLC**

9. EA is a full-service management company that sells on Amazon's platform using only the fulfilled by Amazon ("FBA") model. With more than a hundred employees, a 50,000 square foot warehouse in Miami, Florida, and separate offices in Bogota, Columbia and Puerto Rico, EA has direct control over the picking, packing, and shipping processes associated with its operations. EA is projected to generate more than $50 million in gross revenue in Amazon sales in 2024.

10. EA was accepted as a member of Amazon's distinguished Service Provider Network ("SPN") on October 16, 2023, and subsequently became an active member of the program on January 30, 2024, which is a group of vetted third-party service providers who assist with almost every step of selling with Amazon. Members on Amazon's service provider network, such as EA, meet a required set of rigorous standards, and they are qualified and trained on Amazon guidelines and policies.

11. Accordingly, as a member of Amazon's service provider network, EA provides comprehensive account management services, including inventory control, compliance with Amazon policies, and seller support communication.

3

12. EA's clients are generally comprised of individuals or single owner entities who want to sell on Amazon, but lack the time and resources needed to run an e-commerce business. As such, EA offers its clients the unique ability to handle some of the more time-intensive tasks needed to run this kind of business so EA's clients can take on a more passive approach to owning their own online store.

13. Among the services offered by EA, it provides product sourcing services for its clients.

14. EA utilizes its clients' capital contributions to increase their combined purchasing power, which helps EA secure economies of scale that allow it to offer more favorable wholesale prices, ultimately resulting in increased profits for both EA and its clients when reselling products.

15. EA starts this process by first determining the amount of product its clients want to purchase in a given month. When determining which products to purchase, EA goes through a careful selection process. EA performs this same analysis across hundreds of ASINs ("Amazon Standard Identification Numbers") to avoid a situation where EA's clients might be selling the same products or potentially competing against one another. Once the EA team finds the right products, EA then negotiates bulk deals on its clients' behalf.

16. Importantly, EA team members personally meet with every vendor and supplier in its network and confirm that they are legitimate and sell authentic goods before EA ever does business with them.

17. Once these purchased products arrive at EA's warehouse, EA's team conducts a quality control inspection to verify they match their corresponding Amazon listing description and are in sellable condition. If these products pass EA's inspection, they are then prepped and shipped to Amazon's FBA warehouse for EA's clients to sell in their stores.

**B.     Compromised Accounts and Amazon's Response**

18. On or around March 21, 2024, EA began experiencing a series of account deactivations, freezing of client funds, and other adverse actions that ultimately impacted an incredible 595 of its clients' seller accounts.

19. These deactivated accounts range from new accounts that never sold product to established accounts that have six-figure sales.

20. EA initially believed the deactivations were due to a verification issue because each of EA's affected clients received the same notice that Amazon was unable to verify information related to their seller accounts. ***See* Composite Exhibit A.**

21. In response, EA submitted utility bills, credit card statements, bank statements, and/or other business documents (e.g. EIN letter) on behalf of its clients needing reverification, but doing so did not resolve the issue. Instead, Amazon replied to EA's submissions with another generic notice, this time informing EA that it was unable to reactivate these client accounts because their seller accounts were used "to engage in *deceptive, fraudulent, or illegal activity that harms our customers*, other selling partners, and our store." *See Id.*

22. The purported basis for these notices is wrong. EA operates its business with transparency and integrity and is, and has always been, ready and willing to produce a complete paper trail that shows each product in EA's clients' stores as authentic.

23. When EA contacted Amazon's "Seller Support" for further assistance on this issue, EA was connected to protocol scripted call center agents who could not effectively assist EA. More specifically, these agents provided EA with the following statements in response to our request for further assistance with these deactivations:

- "There is absolutely no path forward here. You may no longer sell on Amazon";
- "We cannot tell you anything at all about the issue on your account"; and

- "Amazon literally does not allow us to tell you anything or escalate past this stage. We are sorry there is nothing you can do."

24. For one client, EA was told to submit another utility bill without receiving any indication as to what the issue was with the first utility bill EA submitted on its client's behalf. It is common practice for Amazon to request the same documents over and over again despite having been sent the requested documents, sometimes even on multiple occasions.

25. Simply put, EA has tried going through the proper channels to resolve these deactivations, but Amazon's support team is too ineffective and ill-informed to meaningfully address EA's clients' issues.

26. Since these deactivations first started, EA hired two separate third-party appeal companies that specialize in reinstating Amazon accounts. EA even tried to hire a third appeal company who advised they believed EA's clients were facing a simple reverification issue.

27. With respect to the two companies EA did hire, EA paid between $3,000 to $6,000 and gave each of them one client account to test out. If EA were to hire these appeals specialists for the rest of its clients' stores that have been deactivated, EA would have to pay in the high six figures with no guarantee that the accounts would be reinstated. Thus far, these two appeals specialists have not been able to get any client accounts reactivated.

C. **Amazon's Destruction of EA's Client's Inventory and Seizure of Property.**

28. Perhaps the more troubling development, after having made seemingly random and arbitrary determinations to deactivate accounts, Amazon holds all "deactivated" account inventory – even products unrelated to any "offense" – and confiscates, disposes of or destroys the seller's inventory without any compensation or return of the inventory.

29. During the time which an account is "deactivated," Amazon freezes that seller bank account – which in most cases have positive account balances in the thousands – and charges the

client account service fees (which in reality are inventory disposal fees), and inventory storage fees.

30. The breakdown of the damages caused by Amazon's indiscriminate actions are as follows:

**Total Inventory Held/Disposed:**
Inventory Held Value:
Inactive (Deactivated) Stores: $5,205,000
Active Stores: $1,956,000
Total Inventory Held: **$7,161,000**

Disposed Inventory Value:
Inactive (Deactivated) Stores: $730,889
Active Stores: $35,274
Total Value of Disposed Inventory: **$766,163**

**Total Funds Held:**
Inactive (Deactivated) Stores: $453,965
Active Stores: $70,794
Total Funds Held: **$524,759**

**Fees Charged to EA Client's Accounts:**

Storage Fees:
Inactive (Deactivated) Stores: $131,710
Active Stores: $47,906
Total Storage Fees: **$178,977**

Removal Fees:
Inactive (Deactivated) Stores: $1,019,765
Active Stores: $355,989
Total Removal Fees: **$1,375,754**

Disposal/Removal Fees for Disposed Inventory:
Inactive (Deactivated) Stores: $129,168
Active Stores: $15,813
Total Disposal/Removal Fees: **$144,881**

31. Additionally, the total value of the management service agreements EA has with its impacted clients is approximately **Eighteen Million Four Hundred Ninety-One and Five Hundred Dollars ($18,491,500.00).**

7

32. In total, the potential damage caused Amazon's indiscriminate action could reach approximately **Twenty-Eight Million Six Hundred Forty-Three Thousand Seven Hundred Seventy-Seven Dollars ($28,643,773.00)**.

33. The final result is total devastation of businesses and livelihoods on a widespread scale, including EA and its many customers.

D.  **Amazon's Actions Have Caused Irreparable Harm and Loss of Livelihoods.**

34. Despite EA's repeated efforts to cooperate and resolve the matter, Amazon has provided no clear explanation for its account deactivation, account freezing, or inventory destruction policies affected EA and hundreds of its clients.

35. EA complied with all of Amazon's requests for documentation and verification, yet Amazon continued to take arbitrary actions causing irreparable harm to EA and its clients.

36. EA is unable to conduct business, fulfill orders, or maintain its relationships with hundreds of its affected clients, which has resulted in significant reputational damage and a loss of goodwill to EA that it has developed over the years as a leader in the FBA model.

37. The financial impact of Amazon's actions is severe. Not only are tens of millions of dollars at stake, but EA's affected clients, many of whom are individuals, stand to lose their livelihoods.

38. The inability to fulfill customer orders has not only resulted in lost sales to EA and its affected clients but has also damaged EA and its affected clients' reputation with the purchasing public.

39. EA clients rely on EA to provide it with authentic goods for resale on Amazon's platform, given its membership in Amazon's distinguished SPN.

8

40. Many of EA's affected customers, who relied on EA as a vetted and trustworthy supplier, have complained and threatened suit against EA over Amazon's actions further causing diminution of customer trust and EA's reputation, goodwill and brand.

41. One such client has acted on their threat, representing EA's first lawsuit with a client. EA is currently defending itself in the case styled *Aaron Merkow v. Ecom Authority, LLC*, Case No. 2024-016329-CA-01, pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. Mr. Merkow's lawsuit stems from Amazon's suspension of his account on July 10, 2024, as part of Amazon's broader actions impacting hundreds of EA's clients. Without seeking any resolution or refund, Mr. Merkow filed the lawsuit, directly attributing his account's suspension to EA. This litigation — the first EA has faced from a client — highlights the far-reaching consequences of Amazon's wrongful deactivation policies, which are not only compromising EA's reputation but also forcing EA to divert its resources from business operations to defending itself in legal disputes that are a direct result of Amazon's misconduct.

42. Each day that passes without EA's clients' access to their accounts and inventory results in further irreparable harm to EA and its affect customers' business. The loss of revenue, business opportunities, and customer relationships and destruction of livelihoods continues to compound, leaving EA with no means of recovery without immediate court intervention.

**E. Congress Has Taken Notice of Amazon's Flawed, Automated Procedures.**

43. Amazon's actions in this case reflect an overly broad and arbitrary approach to compliance, ostensibly in response to the INFORM Consumers Act (the "Act").

44. Upon information and belief, EA believes that in its effort to enforce compliance with the Act, Amazon appears to have implemented unrefined controls, likely through the use of A.I technology, that fail to distinguish between legitimate sellers like EA and those who are

genuinely engaged in fraudulent conduct. This indiscriminate approach throws the baby out with the bathwater, and has devastated EA's and other's businesses, causing irreparable harm through the loss of inventory, revenue, and market opportunities.

45. Moreover, Amazon's ability to monitor the sales activities of EA and its clients through the SPN raises serious questions about the inconsistency of its deactivation practices. If EA were truly engaged in any wrongdoing, such as selling counterfeit goods, Amazon could easily review the relevant sales data and take appropriate action based on objective information. However, rather than applying its policies uniformly, Amazon has selectively deactivated some of EA's clients' accounts while allowing others — whose inventory is sourced from the same suppliers and processed in the same manner — to continue selling without disruption. This arbitrary and inconsistent approach highlights the lack of transparency and fairness in Amazon's deactivation processes, which could be handled far more equitably given Amazon's comprehensive access to data regarding the legitimacy of the goods sold by EA and its clients.

46. In short, the issues faced by EA are not isolated; they are part of a broader pattern of arbitrary actions by Amazon that have drawn significant criticism from government representatives. Members of Congress, including Congressman Christopher Smith, have expressed deep rooted concern over Amazon's unfair enforcement practices, which have negatively affected numerous small businesses across the country.

47. Congressman Smith, in his letter, specifically highlights Amazon's arbitrary actions in suspending seller accounts and seizing inventory without providing adequate justification or due process. The letter underscores the lack of transparency and accountability in Amazon's decision-making processes, and calls into question the platform's compliance measures, which, like here, often punish legitimate sellers while ostensibly attempting to curb fraudulent activity.

The letter from Congressman Smith reflects mounting frustration over Amazon's unwillingness to distinguish between compliant sellers and those acting in bad faith, and it advocates for reforms that would protect small businesses from unwarranted penalties. A copy of Congressman Smith's letter is attached hereto as **Exhibit B**.

48. Despite full cooperation by EA and its customers in providing documentation, fulfilling verification requests, and demonstrating the legitimacy of products, Amazon has persisted in denying reactivation of EA's managed accounts and has unlawfully disposed of or seized its inventory, without any compensation. Therefore, this lawsuit seeks to put an end to Amazon's wrongful actions and to obtain compensation for the substantial losses inflicted on EA's business.

**Count 1: Breach Contract**

49. Plaintiff incorporates and realleges paragraphs 1 through 48 as if set forth fully herein.

50. EA and Amazon entered into the Service Provider Network Agreement ("SPN Agreement"). The SPN Agreement is a valid and binding contract.

51. The SPN Agreement was intended to confer upon EA the right and ability to operate as a designated member of Amazon's Service Provider Network ("SPN"), a status that includes the privilege of using the Amazon SPN trademark (the "Amazon SPN Mark"). The Amazon SPN Mark serves as a clear indication that EA is a trusted, vetted service provider, recognized by Amazon as compliant with its guidelines and policies. EA's ability to utilize this Amazon SPN Mark was central to its business operations, as it signified to the public, clients, and partners that EA was operating at a higher standard – one of professionalism, integrity, and adherence to Amazon's rigorous standards.

Docusign Envelope ID: 59449211D-0A41-4D81-A9E2-3B2CBB15442F

52. In fact, the introductory paragraph of the SPN Agreement provides that Amazon will provide a directory service which "[e]nables third-party service providers [such as EA] to make information about their services available to third party sellers [e.g. Amazon store owners] on Amazon."

53. Moreover, Section 9 of the SPN Agreement specifically provides that:

> Amazon grants to [EA] a non-exclusive, non-transferable, non-assignable, non-sublicensable, and revocable license to use the Amazon Service Provider Network logo (as described in more detail in Exhibit A of these terms, the 'Amazon Mark') once in the body of a single web page promoting [EA's] services to Amazon Sellers.

54. EA's ability to use the Amazon SPN Mark under the terms of the SPN Agreement was a critical component of the Agreement, as it conferred a visible mark of legitimacy and trust to EA's clients and the broader marketplace.

55. By its own advertising, Amazon promoted members of the SPN as "expert help for your business," and bolstering its members as "[a] group of vetted third-party service providers who can help with almost every step of selling with Amazon."[1] Amazon further promotes trust in its SPN members by advertising that "[p]roviders meet a required set of standards, and they're qualified and trained on Amazon guidelines and policies."[2]

56. EA used its SPN member designation in order to instill confidence with its clients that EA is a trusted and vetted source to assist clients successfully establish their Amazon stores.

57. Amazon has undermined and materially breached the SPN Agreement by, on the one hand, promoting SPN members, such as EA, as a trusted and verified source for management and product procurement for current and prospective Amazon store owners, and on the other,

---

[1] Available at: https://sell.amazon.com/tools/service-provider-network
[2] *Id.*

12

implementing an arbitrary and capricious back-office policy that indiscriminately labels EA sourced products as unauthentic or counterfeit resulting in account deactivations.

58. Amazon's policies have incorrectly led to at least 595 EA client seller accounts being compromised, which not only falsely implies that EA is involved in unprofessional or fraudulent conduct, but also has led to the erosion of trust between EA and its clients, many of whom rely on the Amazon SPN Mark as an assurance of EA's status within Amazon's ecosystem.

59. Amazon's actions constitute a direct, material breach of the SPN Agreement, as they have fundamentally damaged the benefits EA was supposed to receive under the contract. EA has been forced to expend countless hours and significant resources attempting to resolve Amazon's unjustified deactivations, and despite these efforts, has suffered a material loss of goodwill and damage to its reputation in the marketplace. Additionally, EA's business operations have been severely impacted, resulting in lost revenue, client trust, and opportunities for future growth.

60. By arbitrarily deactivating and otherwise compromising hundreds of EA's clients' seller accounts without legitimate cause, Amazon materially breached the very purpose of the SPN Agreement and damaged EA's reputation and goodwill.

61. As a result of Amazon's breach, EA has suffered and continues to suffer significant damages, including but not limited to: (1) the costs associated with addressing and attempting to rectify Amazon's wrongful deactivations; (2) damage to EA's business relationships and loss of goodwill; (3) reputational harm caused by the false impression that EA was associated with fraudulent activities; (4) lost business opportunities and diminished client confidence; and (5) any other damages that will be demonstrated at trial.

WHEREFORE, Plaintiff Ecom Authority, LLC respectfully requests that this Court enter judgment in its favor and against Defendant Amazon.com Services LLC, awarding damages in an amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys' fees, and any additional relief this Court deems just and proper.

**Count 2: Breach of Covenant of Good Faith and Fair Dealing**

62. Plaintiff incorporates and realleges paragraphs 1 through 61 as if set forth fully herein.

63. Every contract, including the SPN Agreement, contains an implied covenant of good faith and fair dealing, which requires that neither party take any action that would prevent the other party from receiving the full benefit of the contract.

64. Section 9 of the SPN Agreement grants EA a license to use the Amazon SPN Mark to promote EA's services to Amazon Sellers. EA's ability to use the Amazon SPN Mark is central to its status within Amazon's ecosystem and confers a mark of legitimacy and trust to EA's clients.

65. Amazon materially breached the covenant of good faith and fair dealing by arbitrarily deactivating hundreds of EA's clients' seller accounts. By doing so, Amazon materially undermined the value of the Amazon SPN Mark and frustrated EA's ability to continue operating as a trusted and vetted SPN member.

66. The deactivations falsely suggest that EA is involved in unprofessional or fraudulent activities, damaging its reputation and business relationships and causing the Amazon SPN Mark EA worked so hard to obtain as worthless.

67. Amazon's actions unfairly and improperly frustrated the purpose of the SPN Agreement by depriving EA of the full benefits of the contract, including the continued use of the Amazon SPN Mark to signal EA's preeminent status and compliance with Amazon's standards.

These actions were inconsistent with the reasonable expectations EA had under the Agreement and have led to a significant loss of goodwill associated with EA's business.

68. As a result of Amazon's breach of the covenant of good faith and fair dealing, EA has suffered and continues to suffer significant damages, including but not limited to: (1) the costs associated with addressing and attempting to rectify Amazon's wrongful deactivations; (2) damage to EA's business relationships and loss of goodwill; (3) reputational harm caused by the false impression that EA was associated with fraudulent activities; (4) lost business opportunities and diminished client confidence; and (5) any other damages that will be demonstrated at trial.

WHEREFORE, Plaintiff Ecom Authority LLC respectfully requests that this Court enter judgment in its favor and against Defendant Amazon.com Services LLC, awarding damages in an amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys' fees, and any additional relief this Court deems just and proper.

**Count 3: Breach of Third-Party Beneficiary Contract**

69. Plaintiff incorporates and realleges paragraphs 1 through 48 as if set forth fully herein.

70. Each of EA's customers entered into a Business Solutions Agreement ("Business Solutions Agreement") with Amazon, which governs the sale of goods through Amazon's platform. The Business Solutions Agreement is a valid and binding contract between Amazon and EA's customers.

71. Under the Business Solutions Agreement, Amazon is obligated to provide services that allow sellers, including EA's clients, to list, market, and sell their products on the Amazon platform. Amazon collects fees from sellers in exchange for providing access to these critical

services, and it expressly holds itself responsible for maintaining fair and functional operations of the marketplace.

72. EA is a third-party beneficiary to the Business Solutions Agreement. Amazon was fully aware of EA's participation in managing and optimizing the accounts of its customers, including through the explicit relationship established by EA's designation as a member of Amazon's SPN. The SPN was created specifically to formalize the role of third-party vendors, like EA, in assisting sellers with their Amazon operations. Through the SPN, Amazon not only recognized – it endorsed EA's role in managing its customers' accounts on Amazon's platform.[3]

73. As an SPN member, EA was authorized to use the Amazon SPN Mark, which signified its trusted status and formal participation in managing client accounts within Amazon's marketplace. This designation is evidence of Amazon's direct awareness that its sellers often engage third-party service providers, such as EA, to manage their businesses. The Business Solutions Agreement was entered into with the understanding that EA, as an SPN member, would actively participate in fulfilling the contractual terms, as it directly managed the day-to-day operations of many of Amazon's seller accounts.

74. The Business Solutions Agreement does not exclude third-party vendors, nor does it prohibit sellers from using trusted service providers like EA to assist in managing their accounts. In fact, Amazon's establishment of the SPN effectively encourages this practice by creating a network of approved providers. By enabling EA to operate as a trusted service provider, Amazon acknowledged and accepted that EA had a vested interest in the performance of the Business Solutions Agreement between Amazon and EA's customers.

---

[3] *See Id.*

16

75. Amazon breached the Business Solutions Agreement by arbitrarily deactivating hundreds of EA's clients' seller accounts without legitimate cause. These actions undermined EA's role as a third-party vendor and disrupted its ability to manage its clients' accounts, thus frustrating EA's ability to fulfill its obligations to its clients and depriving it of the benefits it was entitled to as a third-party beneficiary.

76. Amazon's breach of the Business Solutions Agreement was made in bad faith and without regard to the substantial reliance placed on EA's services by its clients. By deactivating these seller accounts without cause, Amazon harmed EA's business operations, diminished its reputation, and interfered with EA's ability to maintain client relationships.

77. As a direct and proximate result of Amazon's breach of the Business Solutions Agreement, EA has suffered significant damages, including but not limited to: (1) loss of revenue and business from clients whose accounts were deactivated; (2) reputational damage caused by Amazon's actions; (3) loss of goodwill with its clients; and (4) additional damages to be proven at trial.

WHEREFORE, Plaintiff Ecom Authority LLC respectfully requests that this Court enter judgment in its favor and against Defendant Amazon.com Services LLC, awarding damages in an amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys' fees, and any additional relief this Court deems just and proper.

**Count 4: Preliminary Injunction**

78. Plaintiff incorporates and realleges paragraphs 1 through 48 as if set forth fully herein.

79. Amazon has wrongfully deactivated hundreds of EA's clients' seller accounts without providing legitimate cause or allowing EA's clients a reasonable opportunity to remedy

any alleged violations under the Business Solutions Agreement. This wrongful deactivation has caused untold damage to EA's business and reputation.

80. Amazon's arbitrary deactivation of these accounts has caused irreparable harm to EA's business operations. EA, as a trusted service provider and member of Amazon's SPN, relies on the continued operation of its clients' accounts to fulfill its business obligations. Without access to these accounts, EA's business relationships have been severely damaged, and its reputation and goodwill in the marketplace have been significantly compromised.

81. As a result of Amazon's actions, EA is suffering irreparable harm for which there is no adequate remedy at law. EA cannot continue to manage its clients' accounts or maintain its status as a trusted provider within Amazon's SPN. EA's inability to provide services has resulted in significant financial losses, damage to its reputation, and a loss of future business opportunities that cannot be remedied solely by monetary damages.

82. Without injunctive relief, EA will continue to suffer irreparable harm, including the loss of its ability to operate within Amazon's marketplace, the ongoing harm to its relationships with its clients, and further reputational damage. Monetary damages are insufficient to address the long-term harm to EA's business and the loss of trust from its clients and the broader marketplace.

83. EA has a substantial likelihood of success on the merits of its claims. Amazon's actions were arbitrary, in violation of the Business Solutions Agreement, and not based on any legitimate evidence of wrongdoing by EA or its clients. Furthermore, the balance of equities favors EA, as it has complied with Amazon's policies while Amazon has wrongfully deactivated its clients' accounts without cause.

84. The issuance of injunctive relief is in the public interest. It will ensure that Amazon does not engage in arbitrary and harmful practices that undermine small businesses and service

providers that depend on its platform to operate, and it will restore fairness to Amazon's business practices.

85. EA is prepared to pay a bond if required, though such a bond should be minimal given the substantial harm EA has suffered and the fact that Amazon controls the accounts, funds, and inventory of EA's clients.

86. EA is entitled to injunctive relief pursuant to Federal Rule of Civil Procedure 65.

WHEREFORE, Plaintiff Ecom Authority LLC respectfully requests that this Court enter an order granting a preliminary and permanent injunction against Defendant Amazon.com Services LLC, requiring Amazon to: (1) reinstate the seller accounts of EA's clients that were wrongfully deactivated; (2) cease any further wrongful deactivations of EA's clients' seller accounts; (3) provide EA's clients with an opportunity to address any alleged compliance issues in accordance with the Business Solutions Agreement; (4) unfreeze all funds and inventory associated with EA's clients' accounts; and (5) for such other relief as this Court deems just and proper.

Dated: October 22, 2024

Respectfully submitted,

/s/ *Paul Turner*
Paul Turner, Esq. (FBN: 113743)
pturner@pbyalaw.com
Ricardo A. Arce, Esq. (FBN: 076201)
rarce@pbyalaw.com
David M. Robbins, Esq. (FBN: 1012340)
drobbins@pbyalaw.com
PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
200 South Andrews Avenue, Suite 600
Fort Lauderdale, Florida 33301
T: 954-566-7117 / F: 954-566-7115
*Attorneys for the Plaintiff*

Case 1:24-cv-24084-CMA   Document 1   Entered on FLSD Docket 10/22/2024   Page 20 of 20

## Verification

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND FLORIDA THAT I HAVE READ THE FOREGOING DECLARATION AND THAT THE FACTS STATED HEREIN ARE TRUE AND CORRECT.

Executed on October 22, 2024.

DocuSigned by:
*Daniel Cohen*
0A1E51F4C3E54E1...

Daniel Cohen