**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

ECOM AUTHORITY, LLC,                     Case No.: 1:24-cv-24084-CMA

     Plaintiff,

v.

AMAZON.COM SERVICES, LLC,

     Defendant.

_____/

## Plaintiff's Amended Motion for Preliminary Injunction

As a thriving Florida-based e-commerce management company, Ecom Authority, LLC ("EA") has found itself at the mercy of Amazon's draconian account deactivation policies, bank account freezes and inventory destruction practices, which have plunged EA's clients — many of whom are small business owners — into crisis. Established as a member of Amazon's Service Provider Network, EA has been a trusted partner to its clients, streamlining their Amazon sales and ensuring compliance with stringent guidelines. Yet, EA now faces an unprecedented emergency: the potential loss of hundreds of client accounts, many of which had established six-figure revenues.

What was thought to be a routine verification issue has quickly escalated into a catastrophic loss of inventory, revenue, and livelihoods, with Amazon's automated systems seemingly targeting legitimate clients of EA without support. EA's concerted efforts to resolve Amazon's arbitrary deactivations have been met with generic responses and ineffective support from Amazon, leaving EA and their clients without recourse. Amazon has indiscriminately confiscated and destroyed inventory worth hundreds of thousands of dollars, while simultaneously freezing bank accounts and charging exorbitant fees for the very inventory to

which it unconscionably disposed.

The repercussions of Amazon's actions are far-reaching, affecting not just EA, but hundreds of small business owners who rely on EA for authentic products and support. With damages potentially reaching nearly $29 million in this case alone, this situation has drawn the attention of Congress, highlighting a disturbing pattern of arbitrary enforcement practices that threaten the livelihoods of countless entrepreneurs including EA and its clients. This Motion for Preliminary Injunction must therefore be granted, or EA and its clients will suffer irreparable harm as a result of Amazon's arbitrary enforcement mechanisms.

## Relevant Background

### A.    About Ecom Authority, LLC

1.      EA is a full-service management company that sells on Amazon's platform using only the fulfilled by Amazon ("FBA") model. *See* Declaration of Danial Cohen attached hereto as **Exhibit A**, ¶ 3; Verified Complaint, (D.E. 1) at ¶9. With more than a hundred employees, a 50,000 square foot warehouse in Miami, Florida, and separate offices in Bogota, Columbia and Puerto Rico, EA has direct control over the picking, packing, and shipping processes associated with its operations. D.E. 1, ¶9. EA is projected to generate more than $50 million in gross revenue in Amazon sales in 2024. Exhibit A, ¶3; D.E. 1, ¶9.

2.      EA was accepted as a member of Amazon's distinguished Service Provider Network ("SPN") on October 16, 2023, and subsequently became an active member of the program on January 30, 2024, which is a group of vetted third-party service providers who assist with almost every step of selling with Amazon. Exhibit A, ¶4; D.E. 1, ¶10. Members on Amazon's service provider network, such as EA, meet a required set of rigorous standards, and they are qualified and trained on Amazon guidelines and policies. Exhibit A,  ¶5; D.E. 1, ¶10.

Accordingly, as a member of Amazon's service provider network, EA provides comprehensive account management services, including inventory control, compliance with Amazon policies, and seller support communication. Exhibit A at ¶6; D.E. 1, ¶11.

3.      EA's clients are generally comprised of individuals or single owner entities who want to sell on Amazon, but lack the time and resources needed to run an e-commerce business. Exhibit A, ¶7; D.E. 1, ¶12. As such, EA offers its clients the unique ability to handle some of the more time-intensive tasks needed to run this kind of business so EA's clients can take on a more passive approach to owning their own online store. Exhibit A, ¶7. Among the services offered by EA, it provides product sourcing services for its clients. Exhibit A, ¶8; D.E. 1, ¶13. EA utilizes its clients' capital contributions to increase their combined purchasing power, which helps EA secure economies of scale that allow it to offer more favorable wholesale prices, ultimately resulting in increased profits for both EA and its clients when reselling products. Exhibit A, ¶9; D.E. 1, ¶14.

4.      EA starts this process by first determining the amount of product its clients want to purchase in a given month. Exhibit A, ¶ 10; D.E. 1, ¶15. When determining which products to purchase, EA goes through a careful selection process. D.E. 1, ¶15. EA performs this same analysis across hundreds of ASINs ("Amazon Standard Identification Numbers") to avoid a situation where EA's clients might be selling the same products or potentially competing against one another. Exhibit A, ¶10; D.E. 1, ¶15. Once the EA team finds the right products, EA then negotiates bulk deals on its clients' behalf. Exhibit A, ¶ 10; D.E. 1, ¶15. Importantly, EA team members personally meet with every vendor and supplier in its network or verify them through trusted references to confirm that they are legitimate and sell authentic goods before EA ever does business with them. Exhibit A, ¶ 11.

5.      Once these purchased products arrive at EA's warehouse, EA's team conducts a quality control inspection to verify they match their corresponding Amazon listing description and are in sellable condition. Exhibit A, ¶12. If these products pass EA's inspection, they are prepped and shipped to Amazon's FBA warehouse for EA's clients to sell in their stores. D.E. 1, ¶17.

**B.      Compromised Accounts and Amazon's Response**

6.      On or around March 21, 2024, EA began experiencing a series of account deactivations, freezing of client funds, and other adverse actions that ultimately impacted an incredible 595 of its clients' seller accounts. Exhibit A, ¶13; D.E. 1, ¶18. These deactivated accounts range from new accounts that never sold product to established accounts that have six-figure sales. Exhibit A, ¶14; D.E. 1, ¶19. EA initially believed the deactivations were due to a verification issue because each of EA's affected clients received the same notice that Amazon was unable to verify information related to their seller accounts. Exhibit A at Composite Ex. A; Exhibit A, ¶15; D.E. 1, ¶20.

7.      In response, EA submitted utility bills, credit card statements, bank statements, and/or other business documents (e.g. EIN letter) on behalf of its clients needing reverification, but doing so did not resolve the issue. Exhibit A, ¶16; D.E. 1, ¶21. Instead, Amazon replied to EA's submissions with another generic notice, this time informing EA that it was unable to reactivate these client accounts because their seller accounts were used "to engage in *deceptive, fraudulent, or illegal activity that harms our customers*, other selling partners, and our store." Exhibit A, ¶17; D.E. 1, ¶21.

8.      The purported basis for these notices is wrong. EA operates its business with transparency and integrity and is, and has always been, ready and willing to produce a complete

paper trail that shows each product in EA's clients' stores as authentic. Exhibit A, ¶18; D.E. 1, ¶22.

9.      When EA contacted Amazon's "Seller Support" for further assistance on this issue, EA was connected to protocol scripted call center agents who could not effectively assist EA. Exhibit A, ¶19; D.E. 1, ¶23. More specifically, these agents provided EA with the following statements in response to our request for further assistance with these deactivations:

- "There is absolutely no path forward here. You may no longer sell on Amazon";
- "We cannot tell you anything at all about the issue on your account"; and
- "Amazon literally does not allow us to tell you anything or escalate past this stage. We are sorry there is nothing you can do."

Exhibit A, ¶19; D.E. 1, ¶23.

10.     For one client, EA was told to submit another utility bill without receiving any indication as to what the issue was with the first utility bill EA submitted on its client's behalf. It is common practice for Amazon to request the same documents over and over again despite having been sent the requested documents, sometimes even on multiple occasions. Exhibit A, ¶20. D.E. 1, ¶24. Simply put, EA has tried going through the proper channels to resolve these deactivations, but Amazon's support team is too ineffective and ill-informed to meaningfully address EA's clients' issues. Exhibit A, ¶ 21; D.E. 1, ¶25.

11.     Since these deactivations first started, EA hired two separate third-party appeal companies that specialize in reinstating Amazon accounts. Exhibit A, ¶ 23; D.E. 1, ¶26. With respect to the two companies EA hired, EA paid between $3,000 to $6,000 and gave each of them one client account to test out. Exhibit A, ¶24; D.E. 1, ¶27. If EA were to hire these appeals specialists for the rest of its clients' stores that have been deactivated, EA would have to pay in the high six figures with no guarantee that the accounts would be reinstated. Exhibit A, ¶24; D.E.

1, ¶27. Thus far, these two appeals specialists have not been able to get any client accounts reactivated. Exhibit A, ¶24.

**C.      Amazon's Destruction of EA's Client's Inventory and Seizure of Property.**

12.      The most troubling development is that after having made seemingly random and arbitrary determinations to deactivate accounts, Amazon holds all "deactivated" account inventory – even products unrelated to any "offense" – and confiscates, disposes of or destroys the seller's inventory without any compensation or return of the inventory. Exhibit A, ¶25; D.E. 1, ¶28. During the time which an account is "deactivated," Amazon freezes that seller bank account – which in most cases have positive account balances in the thousands – and charges the client account service fees (which in reality are inventory disposal fees), and inventory storage fees. Exhibit A, ¶26. The damages caused by Amazon's indiscriminate actions are as follows:

> **Total Inventory Held/Disposed:**
> Inventory Held Value:
> Inactive (Deactivated) Stores: $5,205,000
> Active Stores: $1,956,000
> Total Inventory Held: **$7,161,000**
>
> Disposed Inventory Value:
> Inactive (Deactivated) Stores: $730,889
> Active Stores: $35,274
> Total Value of Disposed Inventory: **$766,163**
>
> **Total Funds Held:**
> Inactive (Deactivated) Stores: $453,965
> Active Stores: $70,794
> Total Funds Held: **$524,759**
>
> **Fees Charged to EA Client's Accounts:**
>
> Storage Fees:
> Inactive (Deactivated) Stores: $131,710
> Active Stores: $47,906
> Total Storage Fees: **$178,977**
>
> Removal Fees:

Inactive (Deactivated) Stores: $1,019,765
Active Stores: $355,989
Total Removal Fees: **$1,375,754**

Disposal/Removal Fees for Disposed Inventory:
Inactive (Deactivated) Stores: $129,168
Active Stores: $15,813
Total Disposal/Removal Fees: **$144,881**

*Id* at ¶ 27; D.E. 1, ¶30.

13.     Additionally, the total value of the management service agreements EA has with its impacted clients is approximately **Eighteen Million Four Hundred Ninety-One and Five Hundred Dollars ($18,491,500.00)**. Exhibit A, ¶28; D.E. 1, ¶31. In total, the potential damage caused Amazon's indiscriminate action could reach approximately **Twenty-Eight Million Six Hundred Forty-Three Thousand Seven Hundred Seventy-Seven Dollars ($28,643,773.00)**. Exhibit A, ¶29; D.E. 1, ¶32. The final result is total devastation of businesses and livelihoods on a widespread scale, including EA and its many customers. Exhibit A, ¶30; D.E. 1, ¶33.

**D.      Amazon's Actions Have Caused Irreparable Harm and Loss of Livelihoods.**

14.     Despite EA's repeated efforts to cooperate and resolve the matter, Amazon has provided no clear explanation for its account deactivation, account freezing, or inventory destruction policies affected EA and hundreds of its clients. Exhibit A, ¶ 31; D.E. 1, ¶34. EA complied with all of Amazon's requests for documentation and verification, yet Amazon continued to take arbitrary actions causing irreparable harm to EA and its clients. Exhibit A, ¶32; D.E. 1, ¶35.

15.     EA is unable to conduct business, fulfill orders, or maintain its relationships with hundreds of its affected clients, which has resulted in significant reputational damage and a loss of goodwill to EA that it has developed over the years as a leader in the FBA model. Exhibit A, ¶33; D.E. 1, ¶36. The financial impact of Amazon's actions is severe. Not only are tens of

millions of dollars at stake, but EA's affected clients, many of whom are individuals, stand to lose their livelihoods. Exhibit A, ¶34. The inability to fulfill customer orders has not only resulted in lost sales to EA and its affected clients but has also damaged EA and its affected clients' reputation with the purchasing public. Exhibit A, ¶35; D.E. 1, ¶37.

16.    EA clients rely on EA to provide it with authentic goods for resale on Amazon's platform, given its membership in Amazon's distinguished SPN. Exhibit A, ¶36. Many of these affected customers, who relied on EA as a vetted and trustworthy supplier, have complained and threatened suit against EA over Amazon's actions further causing diminution of customer trust and EA's reputation, goodwill and brand. Exhibit A, ¶37; D.E. 1, ¶39.

17.    One such client has acted on their threat, representing EA's first lawsuit with a client. Exhibit A, ¶ 38. EA is currently defending itself in the case styled *Aaron Merkow v. Ecom Authority, LLC,* Case No. 2024-016329-CA-01, pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. Exhibit A, ¶38; D.E. 1, ¶41. Mr. Merkow's lawsuit stems from Amazon's suspension of his account on July 10, 2024, as part of Amazon's broader actions impacting hundreds of EA's clients. Exhibit A, ¶38. Without seeking any resolution or refund, Mr. Merkow filed the lawsuit, directly attributing his account's suspension to EA. Exhibit A, ¶38; D.E. 1, ¶41. This litigation — the first EA has faced from a client — highlights the far-reaching consequences of Amazon's wrongful deactivation policies, which are not only compromising EA's reputation but also forcing EA to divert its resources from business operations to defending itself in legal disputes that are a direct result of Amazon's misconduct. Exhibit A, ¶38; D.E. 1, ¶41.

18.    Each day that passes without EA's client's access to their accounts and inventory causes further irreparable harm to EA and its customers' business. Exhibit A, ¶39. The loss of

revenue, business opportunities, and customer relationships and destruction of livelihoods continues to compound, leaving EA with no means of recovery without immediate court intervention. D.E. 1, ¶42.

**E. Congress Has Taken Notice of Amazon's Flawed, Automated Procedures.**

19.     Amazon's actions in this case reflect an overly broad and arbitrary approach to compliance, ostensibly in response to the INFORM Consumers Act (the "Act"). Upon information and belief, EA believes that in its effort to enforce compliance with the Act, Amazon appears to have implemented unrefined controls, likely through the use of A.I technology, that fail to distinguish between legitimate sellers like EA and those who are genuinely engaged in fraudulent conduct. This indiscriminate approach throws the baby out with the bathwater, and has devastated EA's and other's businesses, causing irreparable harm through the loss of inventory, revenue, and market opportunities.

20.     Moreover, Amazon's ability to monitor the sales activities of EA and its clients through the SPN shows the inconsistency of its deactivation practices. Exhibit A, ¶22; D.E. 1, ¶45. If EA were truly engaged in any wrongdoing, such as selling counterfeit goods, Amazon could easily review the relevant sales data and take appropriate action based on objective information. Exhibit A, ¶22; D.E. 1, ¶45. Yet, rather than applying its policies uniformly, Amazon has selectively deactivated some of EA's clients' accounts while allowing others — whose inventory is sourced from the same suppliers and processed in the same manner — to continue selling without disruption. Exhibit A, ¶22;D.E. 1, ¶41. This arbitrary and inconsistent approach highlights the lack of transparency and fairness in Amazon's deactivation processes, which could be handled far more equitably given Amazon's comprehensive access to data regarding the legitimacy of the goods sold by EA and its clients. Exhibit A, ¶22; D.E. 1, ¶41.

21.     In short, the issues faced by EA are not isolated; they are part of a broader pattern of arbitrary actions by Amazon that have drawn significant criticism from government representatives. Members of Congress, including Congressman Christopher Smith, have expressed deep rooted concern over Amazon's unfair enforcement practices, which have negatively affected numerous small businesses across the country.

22.     Congressman Smith, in his letter, specifically highlights Amazon's arbitrary actions in suspending seller accounts and seizing inventory without providing adequate justification or due process. The letter underscores the lack of transparency and accountability in Amazon's decision-making processes, and calls into question the platform's compliance measures, which, like here, often punish legitimate sellers while ostensibly attempting to curb fraudulent activity. The letter from Congressman Smith reflects mounting frustration over Amazon's unwillingness to distinguish between compliant sellers and those acting in bad faith, and it advocates for reforms that would protect small businesses from unwarranted penalties. A copy of Congressman Smith's letter is attached hereto as **Exhibit B**.

23.     Despite full cooperation by EA and its customers in providing documentation, fulfilling verification requests, and demonstrating the legitimacy of products, Amazon has persisted in denying reactivation of EA's managed accounts and has unlawfully disposed of or seized its inventory, without any compensation. Exhibit A, ¶39; D.E. 1, ¶48.

## Argument

### 1. Applicable Standard

A preliminary injunction is a critical tool used to maintain the status quo and preserve the district court's power to render a meaningful decision after a trial on the merits. *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cty. Fla*., No. 20-CV-21084-SCOLA/TORRES, 2020 U.S. Dist.

LEXIS 175990, at *11 (S.D. Fla. Sep. 23, 2020) (quotations and citations omitted). Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff 's rights before a case can be resolved on its merits. *Id.*

To obtain a preliminary injunction, a movant must satisfy four elements: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that the balance of equities favors the movant; and (4) that the public interest would not be adversely affected by the issuance of the injunction. *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001). The movant is not required to prove its case in full at this stage, but rather must present enough evidence, the burden of persuasion, to warrant the extraordinary remedy of injunctive relief. *See Siegel*, 234 F.3d 1163 at 1176.

## 2. <u>First Element</u>: EA is Likely to Succeed on the Merits on its Claims.

"'A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain* success.'" *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 U.S. App. LEXIS 10263, at *31 (11th Cir. Apr. 15, 2022) (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1298 (11th Cir. 2005)) (emphasis in original). "When plaintiffs assert multiple claims as a basis for a preliminary injunction, they 'need only establish a substantial likelihood of success on one claim.'" *Boggs Contracting, Inc. v. Freismuth*, No. 6:21-cv-2088- CEM-EJK, 2021 U.S. Dist. LEXIS 252335, at *5 (M.D. Fla. Dec. 27, 2021) (quoting *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, (M.D. Fla. 2020)).

### A. <u>Breach of Contract</u>

EA is likely to succeed on its breach of contract claim. To prevail on a breach of contract claim under Florida law, a plaintiff must establish: (1) the existence of a valid contract, (2) a material breach of that contract, and (3) damages resulting from the breach. *Renia v. Curtis*

*Protective Servs*., No. 6:19-cv-1724-CEM-DCI, 2022 U.S. Dist. LEXIS 93557, at *14 (M.D. Fla. Mar. 7, 2022) (citations omitted). Here, a valid contract exists between EA and Amazon, specifically the Service Provider Network Agreement ("SPN Agreement") attached hereto as **Exhibit C**. The SPN Agreement was intended to confer upon EA the right and ability to operate as a designated member of Amazon's Service Provider Network (SPN), a status that includes the privilege of using the Amazon SPN trademark (the "Amazon SPN Mark"). SPN Agreement, §9. The Amazon SPN Mark serves as a clear indication that EA is a trusted, vetted service provider, recognized by Amazon as compliant with its guidelines and policies. EA's ability to utilize this Amazon SPN Mark was central to its business operations, as it signified to the public, clients, and partners that EA was operating at a higher standard.

The SPN Agreement provides that Amazon will provide a directory service which "[e]nables third-party service providers [such as EA] to make information about their services available to third party sellers [e.g. Amazon store owners] on Amazon." Moreover, Section 9 of the SPN Agreement specifically provides that:

> Amazon grants to [EA] a non-exclusive, non-transferable, non-assignable, non-sublicensable, and revocable license to use the Amazon Service Provider Network logo . . . once in the body of a single web page promoting [EA's] services to Amazon Sellers.

SPN Agreement, §9.

Amazon materially breached the SPN Agreement when it arbitrarily used back-office policies that indiscriminately labeled EA sourced products as unauthentic or counterfeit resulting in account deactivations of EA's clients. Exhibit A, ¶¶ 13-24; D.E. 1, ¶¶18-27. Incredibly, Amazon has offered no evidence whatsoever that the products being sourced by EA are illegitimate or improper in any way, and they cannot — because EA is properly sourcing and distributing all of its products for its clients. Exhibit A, ¶¶7-12, 19, 31. Amazon's material breach

12

in arbitrarily deactivating the accounts of EA's clients without cause directly contradict the core purpose of the SPN Agreement by diminishing EA's standing as a management company in the eyes of its current and prospective clients.

As a result of Amazon's breach, EA has suffered significant and ongoing damages. Exhibit A, ¶¶ 27-30; D.E. 1, ¶¶30-33. These damages include the substantial operational costs EA has incurred in attempting to rectify the wrongful deactivations, such as hiring third-party appeals specialists and engaging in fruitless correspondence with Amazon's ineffective support services. Amazon's actions also have caused reputational harm to EA, damaging its relationships with its clients, who relied on EA to manage their Amazon accounts effectively.  Exhibit A, ¶¶ 33-35; D.E. 1, ¶30-33. Many of these accounts were generating six-figure revenues, and the resulting deactivations have led to millions of dollars in lost income for both EA and its clients, severely impacting EA's business. Exhibit A, ¶24.

Amazon's arbitrary and unfounded actions clearly constitute a material breach of the SPN Agreement, and EA has incurred significant damages as a result.  EA has accordingly demonstrated a substantial likelihood of success on the merits of its breach of contract claim.

### B.  Breach of Covenant of Good Faith and Fair Dealing

"The duty of good faith extends beyond the written words of the contract." *Young v. Grand Canyon Univ., Inc*., 57 F.4th 861, 873 (11th Cir. 2023) (citations and quotations omitted). "[A] party may breach the covenant of good faith and fair dealing by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Id* (citations and quotations omitted). Applying this principal, a court must look to the "reasonably expected benefits" of the agreement to determine whether one party's actions have unfairly frustrated the other party of the intended benefits. *Id*

(quotations and citations omitted).

In this case, the reasonably expected benefits of the SPN Agreement between EA and Amazon included EA's ability to operate as a designated member of Amazon's SPN, utilize the SPN Mark to signal legitimacy to EA's clients, and manage its clients' seller accounts. As explained above, Section 9 of the SPN Agreement specifically provides EA with a "license to use the Amazon Service Provider Network logo . . promoting [EA's] services to Amazon Sellers."

Amazon breached the implied covenant of good faith and fair dealing by arbitrarily deactivating hundreds of EA's clients' seller accounts, without justification and in contradiction of EA's reasonable expectations under the SPN Agreement. Exhibit A, ¶¶13-24. These deactivations deprived EA of its ability to perform its obligations under the SPN Agreement, damaged its reputation, and significantly undermined the value of the SPN Mark. Amazon's actions, while not expressly prohibited by the terms of the SPN Agreement, bore adversely on EA's "reasonably expected benefits of the bargain," as EA had every right to expect that it would continue to operate as a legitimate member of the SPN so long as it complied with Amazon's guidelines, which it did.

Amazon's conduct — deactivating accounts without cause, failing to substantiate its claims, and providing no meaningful opportunity for resolution — frustrated the very purpose of the SPN Agreement and deprived EA of its expected benefits. Amazon's actions were inconsistent with the spirit of the contract, which required Amazon to act in good faith, particularly in matters that directly impacted EA's ability to manage its clients' accounts and maintain its status within Amazon's ecosystem.

As a result of Amazon's breach of the covenant of good faith and fair dealing, EA has suffered significant damages, including but not limited to: (1) the loss of income and business

opportunities from deactivated accounts, many of which had established six-figure revenues; (2) reputational harm, which has damaged EA's standing with its clients and diminished its goodwill; and (3) the substantial operational costs incurred in attempting to resolve Amazon's unjustified deactivations. Exhibit A, ¶¶27-29.

Amazon's arbitrary actions, which deprived EA of its ability to benefit from the SPN Agreement, clearly constitute a breach of the covenant of good faith and fair dealing and Amazon must be enjoined from continuing its harmful conduct.

### C. Breach of Third-Party Beneficiary Contract

There is also a substantial likelihood on the merits on Count 3 for breach of a third-party beneficiary contract. As alleged in the Verified Complaint, the Business Solutions Agreement is a valid contract in which Amazon is obligated to provide essential platform services to its sellers. EA is a clearly intended third-party beneficiary as a known agent with recognized status in Amazon's Service Provider Network, which relies on Amazon's commitments to EA's sellers to perform account management for its clients. Exhibit A, ¶¶4-6; D.E. 1, ¶72. Amazon breached the Agreement by arbitrarily deactivating EA's clients' accounts, freezing funds, and disposing of inventory without cause, disrupting EA's role as a trusted service provider and preventing it from fulfilling its obligations. Exhibit A, ¶¶13-28; D.E. 1, ¶75. This breach resulted in significant reputational damage, loss of client relationships, and substantial financial harm to EA. Exhibit A, ¶¶31-39; D.E. 1, ¶77.

**3. <u>Second Element</u>: EA will Suffer Irreparable Harm if an Injunction is not Granted.**

Without this Court's intervention, EA's business will be effectively dismantled by Amazon's actions, leading to damage that no monetary remedy can ever truly address. In order to obtain the equitable remedy of an injunction, a plaintiff must establish that they will suffer

irreparable harm, i.e., that there is no adequate remedy at law. *See Reynolds v. Roberts*, 207 F.3d 1288, 1299 (11th Cir. 2000) ("A court enters a preliminary injunction to prevent the plaintiff from being injured, and where there is no adequate remedy at law") (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)).

EA will suffer irreparable harm if Amazon is not enjoined from its unlawful actions, as well as the hundreds of store owners many of which rely on their Amazon store for their livelihood. ***First***, the ongoing damage to EA's reputation and goodwill cannot be adequately compensated by monetary damages. Exhibit A, ¶33; D.E. 1, ¶¶34-42.  As an e-commerce management business that relies on customer trust, EA's ability to procure product sourcing and fulfill client orders and maintain its relationships with customers is critical to its continued success. The deactivation of EA's affected clients' accounts and the wrongful disposal or destruction of inventory has caused substantial harm to EA's reputation, and each day that the affected clients' accounts remain "deactivated" worsens this harm. Exhibit A, ¶33-35; D.E. 1, ¶¶34-42. Courts routinely recognize that loss of goodwill and damage to reputation constitute irreparable harm because they are difficult to quantify and cannot be remedied through monetary compensation alone.

"'The loss of customers and goodwill is an 'irreparable' injury.'" *Fortiline, Inc. v. Moody*, No. 12-CV-81271-RYSKAMP, 2013 U.S. Dist. LEXIS 200015, at *14 (S.D. Fla. Jan. 3, 2013) (quoting *Ferrero v. Associated Materials, Inc*., 923 F.2d 1441, 1449 (11th Cir. 1991)).[1] "The reason being is that the resulting damages are not easily quantifiable in money terms[.]" *Fortiline,* LEXIS 200015 at *14 (internal quotations omitted).

---

[1] *See also Mainsail Parent, LLC v. Jewell*, No. 24-22875-CIV-ALTONAGA/Reid, 2024 U.S. Dist. LEXIS 152480, at *11 (S.D. Fla. Aug. 26, 2024) ("In any event, even without the presumption, Plaintiffs have shown irreparable harm. '[T]he loss of . . . goodwill is an irreparable injury.'") (quoting *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015)).

Additionally, the loss to EA's business opportunities is irreparable. Exhibit A, ¶39. EA's inability to reinstate its affected clients' seller accounts or process replenishment inventory orders has brought the affected business operations to a screeching halt, depriving it of sales opportunities and long-term growth.

> Regarding irreparable harm, this "inquiry seeks to measure harms that no damages payment, however great, could address." . . . "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."

*Socket Sols., LLC v. Imp. Glob., LLC*, No. 1:23-cv-24517-DSL, 2024 U.S. Dist. LEXIS 162489, at *29 (S.D. Fla. Sep. 9, 2024) (internal citations and quotations omitted); *see also ECapital Commer. Fin. Corp. v. Hitachi Cap. Am. Corp.*, 519 F. Supp. 3d 1129, 1136 (S.D. Fla. 2021) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill") (internal citation omitted).

### 4. <u>Third Element</u>: The Balancing of Equities Favors Injunctive Relief.

The balance of equities in this case overwhelmingly favors EA. In deciding whether to grant a preliminary injunction, courts must weigh the respective harms that the nonmovant will suffer from the issuance of the injunction. *See Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001).

In this case, EA faces significant and irreparable harm if Amazon's unlawful actions are allowed to continue, while the harm to Amazon from an injunction would be minimal at best. EA stands to suffer devastating harm if the injunction is not granted. Exhibit A, ¶¶29-29; D.E. 1, ¶18-29. As detailed above, EA's affected business has been brought to a standstill due to Amazon's wrongful deactivation of its clients' accounts and disposal or destruction of its inventory. Exhibit A, ¶¶13-24. Without access to the affected seller accounts, EA is unable to

fulfill orders, generate revenue, or maintain ongoing relationships with customers. Exhibit A., ¶¶33, 35, and 39.

On the other hand, Amazon faces minimal, if any, harm if the injunction is granted. Reinstating EA's affected accounts and halting Amazon's unlawful actions would simply require Amazon to follow the contractual procedures to which it is already obligated to adhere. Amazon is a globally recognized multi-billion-dollar company with vast resources, and the temporary reinstatement of EA's affected clients' accounts pose no significant threat, if any, to its operations, reputation, or financial stability. In fact, Amazon's interest in enforcing its platform policies can still be maintained while this litigation proceeds, as EA has already demonstrated its willingness to comply with Amazon's requests and verification procedures.

The equities in this case tilt heavily in favor of EA with no damage inuring to Amazon upon the injunction being granted. EA is a small business whose *survival is at stake*, whereas Amazon's interests are largely financial and can be addressed in the ordinary course of litigation. Given the stark difference in the harms faced by the parties, the balance of equities strongly favors granting the injunction to prevent further irreparable harm to EA and its affected clients.

   5. **<u>Fourth Element</u>: Granting the Injunction is not Against Public Policy.**

Far from being adverse to the public interest, granting this injunction directly serves it. Courts must ensure that a preliminary injunction is not adverse to the public interest. *Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-cv-1724-CEM-LRH, 2021 U.S. Dist. LEXIS 54101, at *15 (M.D. Fla. Feb. 12, 2021) ("If issued, a preliminary injunction must not be adverse to the public interest"). Far from harming the public interest, this injunction will restore and preserve fairness and protect small businesses.

The public has a strong interest in seeing that contracts are honored, particularly when large platforms like Amazon are involved. By holding Amazon accountable to its own Agreement, this Court will reinforce the principle that even the most powerful companies must abide by their contractual obligations. *See Winmark Corp. v. Brenoby Sports, Inc*., 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014) (holding enforcement of contract an interest in favor of public policy). When a dominant company like Amazon takes unilateral action that threatens to dismantle a small business, it disrupts fair competition and harms the broader public interest in maintaining a competitive and balanced marketplace.

Reinstating EA's clients' accounts and requiring Amazon to adhere to its contractual obligations imposes no negative impact on the public or on Amazon. On the contrary, it would preserve the integrity of the marketplace and ensure that all businesses, regardless of size, are treated fairly.

### 6. No Bond Should Be Required.

Federal Rule of Civil Procedure 65(c) [requires that] . . . "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] *the court may elect to require no security at all*."" "Furthermore, '[a] *bond may not be required*, or may be minimal, when the harm to the enjoined party is slight.'"

*Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-cv-1724-CEM-LRH, 2021 U.S. Dist. LEXIS 54101, at *16 (M.D. Fla. Feb. 12, 2021) (emphases added) (quoting Rule 65(c); *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Ltd. Liab. Co.,* 425 F.3d 964, 971 (11th Cir. 2005); *Lepper v. Franks*, No. 5:18-cv-644-Oc-41PRL, 2019 U.S. Dist. LEXIS 5468, at *7 (M.D. Fla. Jan. 11, 2019); and *Tancogne v. Tomjai Enters. Corp*., 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005). The harm to Amazon from reinstating EA's clients' accounts is

likely non-existent. Its massive resources will remain intact. Allowing EA's clients to regain access to its account is a minor inconvenience for Amazon, if felt at all, but a lifeline for EA and its customers.

**7. Compliance with Issues in Court's Order [D.E. 8] on Prior Injunction Motion**

EA has complied with the issues raised in the Court's Order [D.E. 8] on EA's prior injunction motion [D.E. 6]. A proposed Order on this motion is attached hereto as **Exhibit D** and is being submitted to the Court, pursuant to Section 3I(6) of the CM/ECF Administrative Procedures and Local Rule 7.1(a)(2). In addition, Amazon is receiving notice of the requested relief. Amazon was served with the Complaint. *See* Notice of Filing Return of Service [D.E. 13]. Amazon is also being served this motion. As explained in the below certificate of service, this motion is being served by Federal Express to Amazon's last known address(es), including its Registered Agent and its Legal Department, pursuant to Fed. R. Civ. P. 5(b)(2)(C).

WHEREFORE, EA respectfully requests that this Court grant its Motion for Preliminary Injunction, order Amazon to immediately reinstate EA's affected clients' seller accounts and cease any actions that would further harm EA's business operations, reputation, and goodwill, require Amazon to preserve and protect EA's affected clients' sales proceeds and inventory, refrain from disposing of any remaining assets related to EA's affected clients' accounts, impose a nominal bond or no bond at all given the minimal harm to Amazon and the severe irreparable harm EA faces without relief, and grant such further relief as this Court deems just and proper.

Dated: October 30, 2024.                     Respectfully Submitted,

*/s/ Benjamin L. Reiss*
Benjamin L. Reiss, Esq. (FBN 0985643)
breiss@pbyalaw.com
Paul D. Turner, Esq. (FBN 113743)
pturner@pbyalaw.com
Ricardo A. Arce, Esq. (FBN 76201)

rarce@pbyalaw.com
David M. Robbins, Esq. (FBN 1012340)
drobbins@pbyalaw.com
PERLMAN, BAJANDAS, YEVOLI &
ALBRIGHT, P.L.
283 Catalonia Ave, Suite 200
Coral Gables, FL 33134
T: (305) 377-0086 / F: (305) 377-0781
*Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day of October 30, 2024, on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing. Pursuant to Fed. R. Civ. P. 5(b)(2)(C), which provides that "[a] paper is served under this rule by . . .[m]ailing it to the person's last known address," the foregoing document is being served by Federal Express to Defendant's Registered Agent, Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301 and to Amazon Legal Department, 2021 7th Avenue, Seattle, WA 98121, Attn: General Counsel as of the date hereof.

*/s/ Benjamin L. Reiss*
Benjamin L. Reiss, Esq. (FBN 0985643)
breiss@pbyalaw.com